# EXHIBIT A

1  ELIZABETH C. PRITZKER (SBN: 146267)
2  JONATHAN K. LEVINE (SBN: 220289)
   BETHANY L. CARACUZZO (SBN: 190687)
3  HEATHER P. HAGGARTY (SBN: 244186)
   CAROLINE C. CORBITT (SBN: 305492)
4  RICHARD R. SEAL (SBN: 311131)
   **PRITZKER LEVINE LLP**
5  1900 Powell Street, Suite 450
   Emeryville, California 94608
6  Telephone: (415) 692-0772
   Facsimile: (415) 366-6110
7  Email: ecp@pritzkerlevine.com; jkl@pritzkerlevine.com
8         bc@pritzkerlevine.com; hph@pritzkerlevine.com; ccc@pritzkerlevine.com;
          rrs@pritzkerlevine.com
9

10 *Attorneys for Plaintiffs*

11
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
12                **IN AND FOR THE COUNTY OF ALAMEDA**

13 WAYNE NORDBY, EDWIN CRAWFORD,          Case No: 22CV007071
   EDWARD DWYER, GREGORY
14 FERNANDEZ, ALEXANDER MENGELL,          **COMPLAINT FOR DAMAGES AND**
   LENNIE ORR, JOHN TORRES, JULIE ORR     **INJUNCTIVE RELIEF**
15 AND STACEY MENGELL
16

17                Plaintiffs,
                                          **DEMAND FOR JURY TRIAL**
18        vs.

19
   3M COMPANY;  AGC CHEMICALS
20 AMERICAS, INC.; ALLSTAR FIRE
   EQUIPMENT; AMEREX CORPORATION;
21 ARCHROMA U.S., INC., ARKEMA, INC.;
   BUCKEYE FIRE EQUIPMENT; CARRIER
22 GLOBAL CORPORATION; CHEMGUARD,
   INC.;  DYNAX CORPORATION; E. I. DU
23 PONT DE NEMOURS & CO.; FIRE DEX,
   LLC; FIRE SERVICE PLUS, INC.;  GLOBE
24 MANUFACTURING COMPANY LLC;
   HONEYWELL SAFETY PRODUCTS USA,
25 INC.; JOHNSON CONTROLS, INC.;  KIDDE-
   FENWAL, INC., L.N. CURTIS & SONS; LION
26 GROUP, INC.; MALLORY SAFETY AND
   SUPPLY LLC; MINE SAFETY APPLIANCE
27 COMPANY LLC; MUNICIPAL EMERGENCY
28

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**02/15/2022 at 02:46:23 PM**
By: Xian-xii Bowie, Deputy Clerk

---
                        - 1 -
        COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

5.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.  PFAS have also been found to concentrate in human blood, bones and organs and, most recently, to reduce the effectiveness of vaccines, a significant concern in light of COVID-19. PFAS has also been found to cause epigenetic changes associated with carcinogenesis.

6.     Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in Class B firefighting foams ("Class B foam").[2]

7.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock,[3] as well PFAS-containing turnouts and Class B foam, to firefighting training facilities and fire departments nationally, including in California and in Alameda County. Defendants did so, moreover, without ever informing firefighters or the public that turnouts and Class B foams contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.  Even worse, Defendants concealed the hazardous toxicity, persistence and bioaccumulation of PFAS, and repeatedly misrepresented the safety of PFAS or PFAS-containing materials

8.     The Firefighter Plaintiffs wore turnouts and used Class B foam in the usual and normal course of performing their firefighting duties and training and were repeatedly exposed to PFAS in

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

[2] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction.  The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also

2   received specialized training in high-rise fires, high and low-angle rope rescue operations, and

3   advanced life support. One of his most memorable experiences occurred when he responded to a call

4   for a car that had driven off a cliff at night.  Wayne and his crew had to rappel down to one of the

5   passengers – a young woman – who had been thrown from the car. They managed to stabilize her

6   despite having two collapsed lungs. When she was transported to the hospital, the doctors did not

7   think she would survive, much less walk.  However, she not only survived, but was able to walk

8   again and has stayed in contact with Wayne over the years.  In the course of firefighting training and

9   fire suppression activities, Wayne routinely wore turnouts and has used and/or been exposed to Class

10  B foam.  Blood serum testing conducted in December 2021 shows his PFAS levels are significantly

11  elevated.  Wayne has been diagnosed with and treated for bladder cancer.

12       15.    Edwin Crawford was in the fire service for 33 years in Sacramento County. He worked

13  as a firefighter, fire captain and battalion chief.  His firefighter training included incident command;

14  fire suppression for structures, vehicles and grassland (including use and application of foam); search

15  and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also

16  received specialized training in high-rise fires, high and low-angle rope rescue operations, extensive

17  State Fire Marshall training, and advanced life support, as well as a Bachelor of Arts in Fire

18  Administration. One of his most memorable moments occurred when he responded to a call for a

19  man who had been stabbed in the chest, puncturing his heart and causing severe internal bleeding.

20  Edwin fashioned a MAST (military anti-shock trousers) device to keep the blood in the upper part

21  of the body and the man survived.  In the course of firefighting training and fire suppression

22  activities, Edwin routinely wore turnouts and has used and/or been exposed to Class B foam.  Blood

23  serum testing conducted in December 2021 shows his PFAS levels are significantly elevated.  He

24  has been diagnosed with and is being treated for ulcerative colitis and kidney cancer.

25       16.    Edward Dwyer has been in the fire service for 42 years working as a firefighter and

26  fire engineer, serving in Alameda County for 22 years. His firefighter training included incident

27  command; fire suppression for structures, vehicles and grassland (including use and application of

28  foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical

19.     Lennie Orr was in the fire service for 31 years in Alameda County as a firefighter, fire engineer, fire captain, and battalion chief.  His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. Lennie also received specialized training in high-rise fire ground command, low-angle rope rescue operations, and fire administration. One of the contributions Lennie is most proud of is the work he did with the Alameda County Chiefs Association to implement the first Incident Command teams after the Oakland Hills Fires and the first fully-staffed heavy rescue in the Bay Area. In the course of firefighting training and fire suppression activities, Lennie routinely wore turnouts and has used and/or been exposed to Class B foam.  Lennie was diagnosed with and treated for prostate cancer and follicular lymphoma for which he continues to be treated.

20.     John Torres was in the fire service for 30 years in Alameda County as a firefighter and fire captain.  His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. John also received specialized training in high-rise fires, high and low-angle rope rescue operations, and advanced life support.  He has also worked as an EMS and firefighting training instructor for decades at Chabot College.  One of his most gratifying experiences was working with local businesses to donate to a family that had lost their home in a fire right before Christmas.  In the course of firefighting training and fire suppression activities, Wayne routinely wore turnouts and has used and/or been exposed to Class B foam.  John has been diagnosed with and treated for bladder cancer.

21.     The Firefighter Plaintiffs, individually and collectively, allege that PFAS or PFAS-containing materials developed, manufactured, marketed distributed, released, sold, and/or used by Defendants in turnouts and Class B foam, as herein alleged, caused them to be exposed to PFAS and/or PFAS-containing materials. Such exposure was a substantial factor and proximate cause of the cancers, serious illnesses and bodily injuries suffered by the Firefighter Plaintiffs, as alleged herein.

28.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in California. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

29.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

30.     Defendant Buckeye Fire Equipment ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in California. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

31.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in California. Carrier has its principal place of business in Palm Beach Gardens, Florida.  Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

32.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation that does business throughout the United States, including conducting business in California. Chemguard has its principal place of business in Marinette, Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

33.     Defendant Dynax Corporation ("Dynax") is a New York corporation that does

corporation that does business throughout the United States, including conducting business in California. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

39.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in California. Johnson Controls has its principal place of business in Milwaukee, Wisconsin.  Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

40.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that does business throughout the United States, including conducting business in California. Kidde-Fenwal has its principal place of business in Ashland, Massachusetts. Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and in the County of Alameda.

41.     Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in California.  Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

42.     Defendant L.N. Curtis & Sons ("LN Curtis") is a California corporation that does business in California. LN Curtis has its principal place of business is Walnut Creek, California.  LN Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

48.     Defendant Perimeter Solutions, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in California. Perimeter Solutions has a principal place of business in Rancho Cucamonga, California. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

49.     Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in California. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

50.     Defendant Ten Cate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in California. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

51.     Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in California. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

52.     Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in California. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California and the county of Alameda.

§ 410.10 and Article VI, § 10 of the California Constitution.  The injuries and damages alleged herein are in an amount within the jurisdiction of this Court.

61.     The Firefighter Plaintiffs' exposure and Plaintiffs' injuries, resulting from the acts of Defendants alleged herein, occurred in Alameda County, California. Venue is proper is this Court under California Code of Civil Procedure § 395(a).

## SUBSTANTIVE ALLEGATIONS

**A.     The Firefighters Plaintiffs' Use of and Exposure to PFAS-Containing Products**

62.     The Firefighter Plaintiffs are 7 current and retired firefighters who have served the county of Alameda and surrounding counties as firefighters and worked in various fire stations, engine, truck, and specialized companies for decades.[4]

63.     As first responders to fire and other emergency and medical calls, the Firefighter Plaintiffs risk their lives on a daily basis. They not only save lives and homes, they provide emergency services and medical care, perform rescues, and offer support to people in traumatic circumstances. To prepare them for this enormously challenging work, the Firefighter Plaintiffs wear turnouts and receive extensive and ongoing training in fire suppression (including the preparation and use of Class B foam), fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

64.     The Alameda County Fire Department was formed in 1993 and was a consolidation of various Alameda County fire departments.  The department serves 508 square miles and a population of 394,000, including in the cities of San Leandro, Dublin, Newark, Union City and Emeryville, and adjacent unincorporated areas.

65.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of California, the county of Alameda and neighboring

---

[4] Two of the firefighter spouses, referred to herein as Spouse Plaintiffs, independently assert claims for loss of consortium as detailed more fully below at ¶¶ 270-275.

particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.[8] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' vehicles and homes.[9]

71.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic.".[10] The memo concluded "continued exposure is not tolerable.".[11]

72.    As alleged herein, the Firefighter Plaintiffs wear and/or wore turnouts in the ordinary course of performing their duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

73.    The Firefighter Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing their duties. The turnout gear worn or used by the Firefighter Plaintiffs did not and does not contain labeling information saying that the gear contains PFAS, and similarly did not and does not warn the Firefighter Plaintiffs of the health risks associated with exposure to PFAS.

74.    Like fire departments across the country, many Plaintiffs only had one set of turnouts for years, and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

---

[8] *Id.*

[9] *Id.*

[10] Robert Bilott, *Exposure* (2019), pg. 174.

[11] *Id.* at pg. 175.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

80.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.



81.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use – all as depicted in the exemplar photographs below. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).



82.     As alleged herein, the Firefighter Plaintiffs used and/or were exposed to Class B foam in the ordinary course of performing their duties as it was intended to be used and in a foreseeable manner which exposed them to significant levels of PFAS.

83.     The Firefighter Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known that the Class B foam they used and/or were exposed to in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used and/or were exposed to in performing their duties.

84.     These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to the Firefighter Plaintiffs, and continue to pose a significant health threat to them given the bioaccumulation, pervasiveness and persistence of PFAS.

**B.      The Chemical Structure of PFAS Makes Them Harmful to Human Health**

85.     PFAS are known as "forever chemicals" because they are immune to degradation, bio-

1    higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[18]

2        88.     In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018

3    assessment of short-chain PFAS, also known as "GenX," finding that two of Defendant Chemours

4    GenX chemicals are ***more toxic*** than PFOA—the highly toxic chemical they were intended to

5    replace.[19]

6        89.     To date, there is no safe, acceptable or "normal" level of PFAS in the human body.

7    Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a

8    substantial risk to human health. Defendants' assertions that their products are safe because they do

9    not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of

10    their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS

11    which degrade into PFOA and PFOS.[20]

12        90.     PFAS exposure affects nearly every system in the human body.[21] It has been

13    associated with multiple and serious adverse health effects in humans including, but not limited to,

14    cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative

15    colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in

16    gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor

---

20    *Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

21    [18] Martin Scheringer et al., *Helsingør Statement on Poly- and Perfluorinated Alkyl Substances* (PFASs), Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X.

23    [19] Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA*, Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistent-pollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40.

25    [20] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), United States Environmental Protection Agency, (Nov. 2017), https://www.epa.gov/sites/production/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

27    [21] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony*, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.

1  (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-

2  containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[24]

3      97.     Defendant Lion began to manufacture, market and sell turnout gear in 1970.  Since its

4  founding, and continuing through to the present, Lion makes, markets and sells turnout gear using

5  PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by

6  Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture

7  barrier fabrics supplied by Defendant Gore.[25]

8      98.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the

9  protective gear industry and becoming one of the leading manufacturers of turnouts.  Honeywell

10 makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants

11 DuPont, Gore, PBI and StedFast.

12      **D.     Defendants Know Exposure to PFAS Causes Serious Health Impacts**

13      99.     Defendants, including specifically 3M and DuPont, have long known about the serious

14 and significant impacts to health caused by exposure to PFAS, having conducted study after study on

15 the exposure and health effects of PFAS on animals, and in some cases, even on their own employees.

16 The findings of these studies were discussed within the companies internally, yet were never made

17 public or shared with any regulatory agencies.  Among the findings:

18      a.  A 1950 3M study showed that PFAS could build up in the blood of mice and
19          that PFAS could bind to proteins in human blood suggesting that PFAS would
20          not only remain, but also persist and accumulate in the body of the exposed
            individuals with each additional exposure.[26]

21      b.  In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and

22

23

24 [24] *See Globe History*, Globe MSA Safety Website, (last visited February 26, 2021),
   https://globe.msasafety.com/history; *Turnout Gear Materials*, Globe MSA Safety Website, (last
25 visited February 26, 2021), https://globe.msasafety.com/materials.
   [25] *See    Our    History*,    Lion    Website    (last    visited    September    29,    2021),
26 http://www.lionprotects.com/lion-history; *Firefighter Turnouts*, Lion Website (last visited September
   29, , 2021), https://www.lionprotects.com/firefighter-turnout-gear#.
27 [26] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From
   Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-
28 DuPont-Timeline_sm.pdf; *see also*, https://www.ewg.org/pfastimeline/.

specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[36]

j.  In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[37]  Another study of workers found a link between PFOA exposure and prostate cancer.[38]

k.  In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[39]  DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[40]

l.  On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA".  3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[41]

100.  Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.[42] These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[43]

101.  In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the EPA information that "reasonably supports the conclusion" that a chemical presents a

---

[36] *Id*. at fn. 26.
[37] *Id*.
[38] *Id*.
[39] *Id*.
[40] *Id*.
[41]  Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.
[42] *Id*. at fn. 26.
[43] *Id*.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  PFAS-containing products, including turnouts and Class B foam, and continued to publicly claim that

2  these products were safe.  Defendants affirmatively suppressed independent research on PFAS, and

3  instead commissioned research and white papers to support their claims that PFAS and PFAS-

4  containing products were safe to use, engaging consultants to further this strategy and ensure that

5  they would continue to profit from these toxic chemicals and products.

6        107.    As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS

7  industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar

8  and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and

9  regulation on the revenue stream generated by PFOA."  The strategy was further described by

10  consultant as follows:

11  
12        DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . .The outcome of
      this process will result in the preparation of a multifaceted plan to take control of the

13        ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation,
      and almost certain medical monitoring hurdles. The primary focus of this endeavor

14        is to strive to create the climate and conditions that will obviate, or at the very least,
      minimize ongoing litigation and contemplated regulation relating to PFOA. ***This***

15        ***would include facilitating the publication of papers and articles dispelling the***
      ***alleged nexus between PFOA and teratogenicity as well as other claimed harm***. We

16        would also lay the foundation for creating Daubert precedent to discourage additional
      lawsuits.[48]

17  
18        108.    Class B foam manufacturers and distributors adopted a similarly aggressive industry

19  campaign to evade government oversight or public attention of the risks posed by their products.  At

20  a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam,

21  which included Defendant Class B foam manufacturers Tyco, Chemguard and National Foam, a 3M

22  representative informed attendees that 3M had discontinued its Class B foam business, citing

23  concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.[49]  Attendees also were

24  informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture

25  _____

26  [48] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President,
    Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

27  [49] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards

28  on      Low-,    Medium-    and    High-Expansion    Foam)    (March    14-15,    2001),
https://assets.documentcloud.org/documents/4178280/NFPA-Schedule.pdf.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective

2  Fabrics).[53]

3      112.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont,

4  3M, and Arkema, to join in a "Global Stewardship Program" and phase out production of PFOA by

5  2015.[54]

6      113.    By this time, Defendants had begun to aggressively manufacture, market and/or

7  distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not

8  pose significant health risks to humans or the environment. But, these claims, too, were false.

9  Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood,

10  and that at least one of them produces the same types of cancerous tumors (testicular, liver, and

11  pancreatic) in rats as had been found in long-chain PFAS studies.[55]

12      114.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia

13  DuPont water contamination case described in paragraph 117, above, began releasing its findings.

14  The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination

15  area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health

16  effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol

17  and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

18      115.    In 2013, DuPont entered an agreement with the EPA and ceased production and use

19  of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells.

20  Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and

21  products—all the while peddling them as safer, and as more easily bio-degraded than long-chain

22

23  [53] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and LION (January 30, 2013),

24  https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited February 13, 2022), https://globe.msasafety.com/our-

25  partners; and *Firefighter & Emergency Response Protection,* DuPont Website (last visited February 26, 2021), https://www.dupont.com/personal-protection/firefighter-protection.html.

26  [54] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited

27  February 13, 2022), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

28  [55] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

1    bright future of doing good in the world.[61]

2        **E.    Defendants Failed to Warn Plaintiffs of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe**

3

4        119.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-

5    accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-

6    threatening diseases, including cancer.

7        120.    Yet, Defendants *did not warn* Plaintiffs that PFAS and Defendants' PFAS-containing

8    products, including turnouts and Class B foams used by the Firefighter Plaintiffs, contained PFAS,

9    or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm

10   and illnesses, including cancer.

11       121.    Instead, Defendants falsely represented—and continue to falsely represent— that

12   PFAS and PFAS-containing products, including turnouts and Class B foams, are safe and not harmful

13   to humans or the environment.

14       122.    Such assertions fly in the face of science and a global movement toward eliminating

15   this class of chemicals from consumer products.  In just this past year, for example, Congress passed

16   legislation to address PFAS in turnouts and foam,[62] and numerous states have severely restricted

17   and/or banned PFAS-containing firefighting foam. For example, California will require sellers of

18   turnout gear to notify purchasers if it contains PFAS, while Colorado has banned PFAS-containing

19   turnouts as of 2022.[63] The U.S. Food and Drug Administration similarly has called for phasing out

20

---

21   [61] *Id.*

22   [62] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters,* Fire Rescue 1, (December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/.

23

24   [63] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States,* Bloomberg Law (June 18, 2020), https://news.bloomberglaw.com/pfas-project/toxic-firefighting-foam-with-pfas-scrutinized-by-multiple-states; Cheryl Hogue, *California Bans PFAS Firefighting Foams,* Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38#:~:text=California%20is%20halting%20the%20sale,US%20market%20to%20do%20so; Marianne Goodland, *While Dozens of Bills Are Getting Axed, A Bill on Firefighting Chemicals Sails On,* Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-(footnote continued)

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

suppression training.

 

125.    Plaintiffs further allege that turnouts containing PFAS or PFAS materials sold by Defendants in California, and used by the Firefighter Plaintiffs in training, emergency incidents, or in fire suppression during their firefighting careers, also contained no warning that the turnouts contain PFAS or PFAS materials.  Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

126.    Below are photos typical of warning labels for turnouts manufactured, marked, sold and distributed by Defendants MSA/Globe and Lion.  As depicted below, the labels do not disclose that the PFAS or PFAS materials in the turnouts are toxic, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.  Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Drag Rescue Device (DRD) Label

**(2)  Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure**

127.   A Material Safety Data Sheet (or "MSDS") is a document that Occupational Safety and Health Administration (OSHA) requires companies to provide to end users for products that contain substances or chemicals that are classified as hazardous or dangerous. Access to such information is necessary for the Firefighter Plaintiffs to provide a safe and effective response in emergency situations.

128.   The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm.  To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were *not* known carcinogens and did not cause birth defects.

129.   Even now, the MSDS do not reflect the known serious health risks and hazards

- 37 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.[68]

c.  2019 – Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

d.  2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she *absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure*." (emphasis added)[69]

e.  2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[70]

f.  Defendant Dynax founder Eduard Kleiner stated that C6-based surfactants [short-chain PFAS] do not bioaccumulate.[71]

g.  2019 – Defendant Gore issued a public statement, stating that "the potential exposures and associated risks of cancer effects from PFOA alternative and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."[72]

---

[68] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

[69] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.

[70] *AFFF Update Newsletter*, Fire Fighting Foam Council (April 2019), https://tinyurl.com/y57c5jwx.

[71] Marc S. Reisch, *What Is the Price of Fire Safety?*, Chemical & Engineering News (January 14, 2019), https://cen.acs.org/business/specialty-chemicals/price-fire-safety/97/i2?ref=search_results.

[72] W. L. Gore and Associates, *Exposure Assessment and Cancer Risk Characterization for Firefighters from Non-Polymeric PFAS Residuals in Gore Components Used in Firefighting Gear*, (August 20, 2019), (footnote continued)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

service thus far have proven to be unsafe."[76]

l.   2020 – Defendant Lion through its hired consultant Chrostowski also stated in Firefighter Nation that all turnouts are compliant with the standards set by the NFPA and Swiss organization OEKO-TEX's Standard 100 for PPE and Materials for PPE. "The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA."[77]

m.   2021 - In a New York Times article, Defendant W.L. Gore maintained that its turnout products were safe.[78]

n.   2021 – Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 (see above), reflect its position: "Dr. Chrostowski's report says it all for Lion."[79]

o.   2021 – Defendants MSA Globe and W. L. Gore have continued to state that their products have been tested and are safe.[80]

p.   2022 – Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.[81] It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels....Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS....It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA

---

[76] Paul Chrostowski, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims* (June 3, 2020), https://www.firefighternation.com/health-safety/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/#gref.

[77] *Id.*

[78] Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic*, New York Times, (January 26, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

[79] David Ferry, *The Toxic Job of Being A Hero*, Men's Health, (September 21, 2021), https://www.menshealth.com/health/a37624731/cancer-firefighter-gear-pfas/.

[80] Andrew Wallender, *Firefighters Want Halt on Money From Makers of PFAS-Laden Gear*, Bloomberg Law, (January 19, 2021), https://news.bloomberglaw.com/pfas-project/firefighters-want-halt-on-money-from-makers-of-pfas-laden-gear.

[81] Jim Spencer, *3M's Support for PFAS Could Cost Taxpayers Billions of Dollars*, Star Tribune (September 11, 2021), https://www.startribune.com/3m-s-support-for-pfas-could-cost-taxpayers-billion-of-dollars/600096094/.

1  false sense that these PFAS-containing turnouts and foams were safe.  The statement reads, in relevant

2  part:

> Importantly, PFOA use has been almost completely phased out in the US....Fire fighters may have additional PFOA exposure sources such as older Class B firefighting foams. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.**  IAFF will continue to monitor developments and update this fact sheet should new information become available.[86]

14    134.    The IAFF maintained the Defendants' position that the turnout gear and Class B foam

15  was safe until new leadership took over in 2021. Because of these and other false claims and

16  misrepresentations on the part of Defendants, Plaintiffs did not know and, in the exercise of

17  reasonable diligence, could not have known that the turnouts and Class B foams they used contained

18  PFAS or PFAS-containing materials, and caused Plaintiffs to be exposed to PFAS and/or PFAS-

19  containing materials, causing them to suffer cancers and other serious illnesses as a result of such

20  exposure.

21    135.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the

22  agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4

23  billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the

24  significant harm their PFAS chemicals have caused to human health and the environment.

25    136.    The Firefighter Plaintiffs only learned for the first time that they had significantly

---

[86] *Statement on PFOA and Turnout Gear*, International Association of Firefighters, (May 2017), https://tinyurl.com/y29mfh69.

exposure" in firefighters.[89]  "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general…population."[90]

139.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study").  The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several production years, as listed below:[91]

| PPE gear manufacturers sampled: | # samples |
| --- | --- |
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

140.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."[92]  According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[93]  The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across

---

[89] *Id.*

[90] *Id.*

[91] *Id.* at fn. 7.

[92] *Id.* at p. A.

[93] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage.  Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen".[96] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[97]



Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

143.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of

---

[96] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[97] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   gear itself and frequent independent testing has found only trace amounts of it in any of the gear –

2   not nearly enough to cause concern, and in amounts similar to consumer products.".[102]  Chrostowski

3   went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS

4   and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less

5   toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous

6   credible published scientific research papers.".[103]  Finally, Chrostowski falsely stated that the link

7   between PFAS exposure and cancer is "extremely weak."[104]

8       147.    And yet, Lion has admitted publicly that dermal absorption is a pathway of exposure

9   to cancer-causing chemicals for firefighters.  In Lion's *Not in Our House* cancer awareness fact sheet



[102] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/ - gref.
[103] *Id.*
[104] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to address the PFAS in turnouts.[109]   Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.

151.   At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to ***other chemicals*** encountered in the line of duty, or firefighters' failure to wash their turnouts after every call.  Not once have the turnout Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm.  Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages ***firefighters themselves to make a pledge to protect themselves from carcinogens linked to cancer*** ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer…") ***while all the while refusing to take any corporate responsibility*** for continually exposing firefighters to carcinogens in their protective gear..[110]

152.   Firefighter Plaintiffs deserve more. They are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about

---

[109] As alleged above, in para. 133 and fn. 85, IAFF has only recently begun to take action related to PFAS exposure due to pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related firefighter safety resolutions passed with the support of 99% of the membership.  The resolutions require IAFF to: (1) sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout gear.  Andrew Wallender, *PFAS Resolutions Overwhelmingly Approved by Firefighters' Union*, Bloomberg Law (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited September 30, 2021), https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

[110] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door*, Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/.

1  could be utilized.  These designs are and were not only technologically feasible, but also

2  economically. Indeed, given the enormous cost of remediation of the environment and litigation, not

3  to mention the cost of human lives, the safe, feasible alternatives would have cost significantly less.

4  160.  In the early 2000s, 3M, in conjunction with Solberg Scandinavian AS developed Re-

5  Healing Foam ("RF"), a high-performance, AFFF-comparable product that contained no

6  fluorochemicals, and resulted in two patents and three commercial products of PFAS-free firefighting

7  foam.  RF met the standard of "ICAO [International Civil Aviation Organization] Level B and

8  matched AFFF in performance including a US MIL-Spec product."[111] In 2007, Solberg bought 3M's

9  patent rights to RF and continued to market and sell RF.  In 2011, Defendant Amerex acquired

10  Solberg and continued to manufacture, market and sell RF. In 2014, the EPA presented Solberg with

11  the Presidential Green Chemistry Challenge Award for its fluorine-free foams; the award recognizes

12  technologies that prevent pollution and match or improve the performance of existing products.[112]

13  In 2018, Defendant Perimeter Solutions in 2018 acquired Solberg and continued to manufacture,

14  market and sell RF.

15  161.  Also, beginning in the early 2000s, BIOEX launched a highly effective, fluorine-free

16  Class B F3 foam which has been approved and used by international airports, fire departments, oil

17  and gas companies, the marine industry and pharmaceutical and chemical companies around the

18  world.[113]

19  _____

20  [111] *Fluorine Free Firefighting Foams (3F) – Viable Alternatives to Fluorinated Aqueous Film-
Forming   Foams   (AFFF)*,   IPEN   Expert   Panel   (September   2018),

21  https://ipen.org/sites/default/files/documents/IPEN_F3_Position_Paper_POPRC-
14_12September2018d.pdf; Schaefer, Ted. H. et al., *New Foam Technology, New Found Benefits*,

22  Solberg,   IAFPA   Sydney   2005   Conference   Proceedings   (Oct.   5-7,   2005),
https://www.solbergfoam.com/getattachment/c5bef149-b850-48df-81a8-19b977c6daed/New-Foam-

23  Technology,-New-Found-Results.aspx;

24  [112] Marc S. Reisch, *What Is the Price of Fire Safety? As Lawsuits Pile Up and Government Pressure
Rises, Firefighting-Foam Makers Reconsider the Environmental Cost of Fluorosurfactants*,

25  Chemical & Engineering News (January 14, 2019), https://cen.acs.org/business/specialty-

26  chemicals/price-fire-safety/97/i2.

27  [113] *Fluorine Free Firefighting Foam (FFF) – Firefighting Foam Concentrates*, BIOEX website (last
visited December 13, 2021), https://www.bio-ex.com/en/our-products/compositions/fluorine-free-

28  foam/; "Major international hubs such as Dubai, Dortmund, Stuttgart, London Heathrow,
(footnote continued)

other fuels.

Conclusions: For the AFFF foams which were intended to work via formation of an aqueous film, fire extinction times were lengthened considerably in cases where film formation was made difficult by the low surface tension of the fuel. *For the non-filming fluorine-free foam, however, no such performance decrement was observed, and the fire extinction times on the lowest surface tension fuel were lower than for fuels with higher surface tensions, and within the 30 second time limit specified (on gasoline) by MIL-F-24385F.*[116] (emphasis added)

164.    Further, the study found that AFFF foams had 25% drain times (between 4-6 minutes) whereas the fluorine-free RF's drain time was 12 minutes. This slower drain time leads to greater burn back resistance and greater safety for firefighters.

165.    The technology to develop safer, effective and economical fluorine-free Class B foam is and has been available for, at least, over 20 years. In fact, many firefighting foam manufacturers and distributors companies manufacture, market and/or sell fluorine-free firefighting foams, including Defendants Tyco, Perimeter Solutions, Chemguard, Johnson Controls, and National Foam.

166.    EUROFEU, an umbrella organization representing fire protection trade associations and companies including Defendant Tyco, even stated in 2019: "We believe that F3s [fluorine-free foams] are very suitable for a growing number of applications such as municipal firefighting, training, some testing and as foam agents in first responding fire trucks."[117]

167.    LAST FIRE, a consortium of international oil companies developing best industry practice in storage tank Fire Hazard Management including Shell Oil, Chevron, BP, Exxon and Defendant Perimeter Solutions, concluded after conducting 200 tests that: "Fluorine free foams can provide equivalent performance to C6 foams [AFFF] and provide appropriate performance for hydrocarbon [fires]."[118]

---

[116] Solberg Foam website, *Re-Healing Foam Fire Performance*, Technical Bulletin, #1009, (last visited December 13, 2021), https://www.solbergfoam.com/getattachment/f8574423-9518-4888-a054-c170c0d9a234/RE-HEALING-Foam-Fire-Performance.aspx.

[117] *The Use of PFAS and Fluorine-Free Alternatives in Fire-Fighting Foams*, European Commission DG Environment and  European Chemicals Agency (ECHA), Final Report, June 2020, p. 273, https://echa.europa.eu/documents/10162/28801697/pfas_flourine-free_alternatives_fire_fighting_en.pdf/d5b24e2a-d027-0168-cdd8-f723c675fa98

[118] *Id*. at pp. 314-315.  Hydrocarbon fires are flammable gas or liquid fires that may involve gas, oil, kerosene, ethanol, propane, acetylene, hydrogen, and methane, to name a few.

172.    While the technology to develop fluorine-free turnout gear has been available for years, the NFPA turnouts standards-setting technical committee continues to adhere to certain guidelines for turnout gear which require PFAS – knowingly putting firefighters at risk for exposure to PFAS. This committee is comprised of industry consultants, textile and gear manufacturers, including Defendants MSA/Globe, Lion, Tyco, and Honeywell. [124]

173.    The economic and technological feasibility of fluorine-free foams and turnout gear is well-established, and based on technology that has been available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks that result from PFAS exposure.

174.    The only barrier to producing safer alternatives to PFAS-containing foams and turnout gear has been Defendants' opposition. Their continued manufacturing, marketing, selling and/or distributing PFAS-containing foams and turnout gear has exposed firefighters to toxic PFAS chemicals. These defective designs are and/or have been a substantial factor in causing Firefighter Plaintiffs' injuries.

175.    Based on all of the foregoing, Firefighter Plaintiffs bring this action for damages and for other appropriate relief sufficient to compensate them for the significant harm Defendants' PFAS chemicals and PFAS-containing products have caused.

## EQUITABLE TOLLING OF APPLICABLE STATUE OF LIMITATIONS

176.    Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

### A.  To the Extent Applicable, the Statute of Limitations Should Be Equitably Tolled Due to Defendants' Fraudulent Concealment and Misrepresentations

177.    Defendants had control over, and superior, if not exclusive, knowledge of the hazardous toxicity, persistence and bioaccumulation of PFAS and PFAS-containing materials for

---

[124] NFPA 1971/1851 Technical Committee Meeting Minutes (March 31, 2020), https://www.nfpa.org/assets/files/AboutTheCodes/1971/1971_F2022_FAE_SPF_Pre-FD_MeetingMinutes_3_20.pdf; NFPA 1971/1851 Technical Committee Meeting Minutes (January 11-12, 2012), https://www.nfpa.org/assets/files/aboutthecodes/1851/fae-spf_pre-rocmeetingminutes_01-12%20(2).pdf

1 Firefighter Plaintiffs.

2 184.   Firefighter Plaintiffs reasonably relied upon, and were deceived by Defendants'

3 representations that their PFAS or PFAS-containing turnouts and/or Class B foam were safe and non-

4 toxic. Firefighter Plaintiffs were unaware that the Class B foam and/or turnouts contained toxic PFAS

5 chemicals.

6 185.   As a result of Defendants' fraudulent concealment and misrepresentations and despite

7 Firefighter Plaintiffs' due diligence, Firefighter Plaintiffs did not and could not have discovered the

8 operative facts - that PFAS were in their turnouts and/or Class B foam and exposed them to toxic

9 levels of PFAS – to form the basis for a cause of action against Defendants within the statute of

10 limitations period.

11 186.   At all times, Defendants are and were under a continuous duty to disclose to

12 Firefighter Plaintiffs the hazardous toxicity, persistence, and bioaccumulation associated with the use

13 of PFAS or PFAS-containing materials in turnouts and Class B foam.

14 187.   For these reasons, any and all applicable statutes of limitations have been tolled as a

15 consequence Defendants' ongoing knowledge, active fraudulent concealment, and misrepresentation

16 of material facts alleged herein.

17

18 **B.  Defendants Should Be Estopped From Using Statute of Limitations as an Affirmative Defense Due to Their Fraudulent Concealment and Misrepresentations**

19 188.   To the extent that certain Plaintiffs did know sufficient facts to file a cause of action

20 against Defendants during any applicable statute of limitations period, Defendants should be estopped

21 from invoking the statute of limitations as an affirmative defense as they have continually,

22 intentionally and knowingly fraudulently concealed and misrepresented material facts about the

23 hazardous toxicity, persistence and bioaccumulation of PFAS and PFAS-containing materials,

24 including Class B foam and/or turnouts, which caused certain Plaintiffs to delay in filing a claim

25 against Defendants.

26 189.   Defendants had control over, and superior, if not exclusive, knowledge of the

27 hazardous toxicity, persistence and bioaccumulation of PFAS and PFAS-containing materials for

28 decades, and they fraudulently and intentionally concealed these facts from Firefighter Plaintiffs for

195.    Based on the foregoing, Defendants are estopped from relying on any and all applicable statutes of limitations in defense of this action.

**C.  To the Extent Applicable, the Statute of Limitations Should Be Tolled**

196.    For over fifty years and to this day, Defendants have fraudulently concealed and actively misrepresented the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and/or turnouts to firefighters, including certain Firefighter Plaintiffs, fire departments, the fire service media and fire organizations in an effort to mask the very serious health and environmental consequences of exposure to PFAS.

197.    Because of Defendants' active and ongoing concealment of the true nature of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and/or turnouts, and their prior knowledge of it, Plaintiffs could not have reasonably discovered the causes of action alleged herein.

198.    Further, it was nearly impossible for Firefighter Plaintiffs to determine whether they had PFAS in their blood and a basis for a claim against Defendants.  Obtaining a PFAS analysis of a blood sample is not readily available to the public, nor is it a test that a medical doctor or regular hospital lab can order much less analyze.

199.    In addition to the obstacles of getting PFAS blood serum levels tested, certain Firefighter Plaintiffs had no realistic ability to discern or suspect that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and/or turnouts were a substantial cause of their injuries until—at the earliest— the Firefighter Plaintiffs received their test results revealing that they had significantly elevated levels of PFAS in December 2021.

200.    The causes of action alleged herein thus did not accrue until certain Firefighter Plaintiffs discovered the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and/or turnouts, and that they had elevated levels of PFAS in their bodies and blood.

201.    Accordingly, Defendants are precluded by the Discovery Rule, which provides that

marketed, tested, inspected, labeled, advertised, promoted, sold and/or distributed by the Defendants are and/or were unreasonably dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the utility and benefit of these products did not outweigh the risks inherent in the design or formulation of the PFAS-containing turnouts and/or Class B foam.

208.    Firefighters wear their turnouts on every shift and use Class B foam regularly in training and firefighting activities. Defendants have known for decades that exposure to PFAS or PFAS-containing materials is toxic to humans and animals, and results in significant – often catastrophic – health effects, including cancer and birth defects.  This risk is heightened for people with consistent exposure to these chemicals which have a long half-life and impact the body on a cellular level.  The risk of such serious health effects is and/or was not outweighed by the utility and benefit of PFAS or PFAS-containing, particularly in light of the availability of PFAS-free turnout gear and firefighting foam.

209.    The turnouts and/or Class B foam designed, manufactured, marketed, tested, inspected, labeled, advertised, promoted, sold, and/or distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, these products posed significant health risks and were unreasonably dangerous in normal use.

210.    The PFAS-containing turnouts and/or Class B foam did not perform as safely as an ordinary firefighter would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

211.    Further, knowing of the dangerous and hazardous properties of PFAS and/or PFAS-containing turnouts and/or Class B foam, Defendants could have manufactured, marketed, distributed, and/or sold alternative designs or formulations of fluorine-free chemicals, fluorine-free turnouts and/or Class B foam.

212.    These alternative designs and/or formulations were already practical, similar in cost, technologically feasible and/or available.

213.    Indeed, in the 1990s, DuPont had a viable replacement for PFOA that was less toxic,

221.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments and/or to companies that sold turnouts and/or Class B foam to fire departments for use by firefighters, such as Plaintiffs.

222.    Defendants' turnouts and/or Class B foam containing PFAS or PFAS-containing materials were unreasonably dangerous for their reasonably anticipated use because exposure to PFAS poses a significant threat to human health.

223.    Defendants knew or should have reasonably known in light of prevailing scientific and industry knowledge that the manner in which they were designing, manufacturing, testing, inspecting, labeling, marketing, distributing, and/or selling turnouts and/or Class B foam containing PFAS was hazardous to human health, and that firefighters, like Plaintiffs, would be exposed to PFAS through ordinary and foreseeable uses of turnouts and/or Class B foam in the course of engaging in firefighting activities and training.

224.    Defendants had a duty to warn against such latent dangers resulting from foreseeable uses of its product of which it knew or should have known.

225.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials.

226.    Defendants, however, breached their duty and failed to provide adequate warnings as to the potential harm that might result from exposure to PFAS or PFAS-containing products that would lead an ordinary reasonable user, such as Plaintiffs, to contemplate the danger to human health posed by such products.

227.    In fact, Defendants failed to issue any warnings, instructions, recalls and/or advice as to the danger of exposure to the toxic PFAS-containing turnouts and/or Class B foam, and the potential for such exposure to cause serious physical injury and disease.

1   with full knowledge that they were sold to fire departments, or to companies that sold turnouts and/or

2   Class B foam to fire departments for use by firefighters such as Plaintiffs.

3       237.    Defendants intended that the PFAS chemicals and/or PFAS-containing turnouts

4   and/or Class B foam that they are and/or were manufacturing, designing, selling, distributing,

5   supplying, testing, labeling, promoting, and/or advertising would be used by firefighters, including

6   Plaintiffs, without any substantial change in the condition of the products from when they were

7   initially manufactured, sold, distributed, and/or marketed by Defendants.

8       238.    Defendants also knew or should have known in light of prevailing scientific and

9   industry knowledge that Plaintiffs would be exposed to PFAS through ordinary and foreseeable uses

10  of these products for the purpose of firefighting activities and training.

11      239.    Defendants had a duty to not endanger the health and safety of Plaintiffs who were

12  foreseeable users of the PFAS-containing turnouts and/or Class B foam that Defendants are and/or

13  were manufacturing, designing, selling, distributing, supplying, testing, labeling, promoting, and/or

14  advertising as firefighter protective safety equipment.

15      240.    Defendants' duty required that they exercise reasonable care in the manufacturing,

16  designing, selling, distributing, supplying, testing, labeling, promoting, and/or advertising of turnouts

17  and/or Class B foam.

18      241.    Defendants breached their duty of reasonable care by negligently manufacturing,

19  designing, selling, distributing, supplying, testing, inspecting, labeling, promoting, and/or advertising

20  of PFAS-containing turnouts and/or Class B foam which were defective and unreasonably dangerous.

21  The turnouts and/or Class B foam contained toxic PFAS chemicals which, as detailed above, are

22  highly mobile, persistent known carcinogens, and immune system disruptors that pose a substantial

23  likelihood of harm to firefighters even when used as directed by the manufacturer for its intended

24  purpose of firefighting activities.

25      242.    PFAS and/or PFAS-containing turnouts and/or Class B foam designed, manufactured,

26  marketed, tested, advertised, promoted, sold and distributed by the Defendants are and/or were

27  unreasonably dangerous and defective in design or formulation because, at the time in which the

28  products left the hands of the manufacturer or distributors, the utility and benefit of these products

1    actions and misrepresentations.

2        249.    The use of these alternative designs would have reduced or prevented the substantial

3    likelihood of harm to Plaintiffs that was caused by the Defendants' design, manufacture, marketing,

4    advertising, promotion, sale and/or distribution of PFAS and/or PFAS-containing turnouts and/or

5    Class B foam.

6        250.    Additionally, the turnouts  and/or Class B foam that were designed, manufactured,

7    marketed, tested, inspected, labeled, advertised, marketed, promoted, sold, and/or distributed by the

8    Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably

9    dangerous to human health and the environment, with the toxic chemicals being highly mobile and

10   persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and/or

11   selling these products was unreasonably dangerous and the foreseeable risks of causing serious health

12   consequences exceeded the benefits associated with the design or formulation of PFAS-containing

13   turnouts and/or Class B foam.

14       251.    Defendants' design of toxic PFAS chemicals and/or PFAS-containing turnout gear

15   and/or Class B foam was unreasonably dangerous and substantial factor in causing Plaintiffs' injuries.

16       252.    As a result of Defendants' defective design, Defendants are liable for such injuries and

17   damages to Plaintiffs.

18       253.    Defendants acted with willful or conscious disregard for the rights, health, and safety

19   of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

20                              **FOURTH CAUSE OF ACTION**

21                          **NEGLIGENCE – FAILURE TO WARN**

22       254.    This cause of action is asserted against all Defendants on behalf of all Plaintiffs.

23       255.    Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though

24   fully set forth herein.

25       256.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities

26   they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing,

27   labeling, promoting, or advertising of turnouts and/or Class B foam containing PFAS or PFAS-

28   containing materials and, through that conduct, have knowingly placed PFAS-containing products

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to the danger of exposure to the toxic PFAS-containing turnouts and/or Class B foam, and the potential for such exposure to cause serious physical injury and disease.

264.   Defendants also did not instruct Plaintiffs on the proper steps they could take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects.

265.   Plaintiffs did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, bioaccumulate in the blood, and cause serious health effects, including cancer - dangers which were not obvious to Plaintiffs.  Had Defendants adequately warned Plaintiffs, they would have heeded such warnings.

266.   The burden on Defendants to guard against this foreseeable harm to Plaintiffs was minimal, and merely required that they provide adequate instructions, proper labeling, and sufficient warnings about their PFAS-containing products.

267.   Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the PFAS-containing, turnouts and/or Class B foam and to take steps to eliminate, correct, or remedy any exposure or contamination they caused.

268.   As a direct and proximate result of Defendants' negligent failure to provide adequate and sufficient warnings, Plaintiffs suffered the injuries and damages described herein for which Defendants are strictly liable.

269.   Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

## FIFTH CAUSE OF ACTION

### LOSS OF CONSORTIUM

270.   This cause of action is asserted against all Defendants on behalf of all of the Spouse Plaintiffs.

271.   The Spouse Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

expenses, lost earnings and other economic damages in an amount to be determined at trial;

(4) Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of the Plaintiffs in particular, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

(5) Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

(7) For equitable and injunctive relief, as necessary, to ensure that Defendants refrain from continuing to harm others; and

(8) Any such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for each cause of action for which they are entitled to a jury trial.

DATED: February 15, 2022          **PRITZKER LEVINE LLP**

By: _____
Elizabeth C. Pritzker (SBN: 146267)
Jonathan K. Levine (SBN: 220289)
Bethany L. Caracuzzo (SBN: 190687)
Heather P. Haggarty (SBN: 244186)
Caroline C. Corbitt (SBN: 305492)
Richard R. Seal (SBN: 311131)

*Attorneys for Plaintiffs*
*Wayne Nordby, Edwin Crawford, Edward*
*Dwyer, Gregory Fernandez, Alexander*
*Mengell, Lennie Orr, John Torres, Julie Orr*
*and Alex Mengell*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF